In the Matter of BENGAL CABARET, INC., Doing Business as NIRVANA, Petitioner, v NEW YORK STATE LIQUOR AUTHORITY, Respondent.—Determination of respondent, dated September 1, 1978, revoking the restaurant liquor license of petitioner and directing bond forfeiture of $1,000, annulled, on the law, Charges Nos. 2, 3 and 4 dismissed, and the matter remanded to respondent for further findings in respect of Charge No. 1, without costs or disbursements. Shamsher Wadud, after coming to this country from Bangladesh in 1963, opened a restaurant called Nirvana in 1970, first on Lexington Avenue and now on Central Park South. It has annually been granted a restaurant liquor license by respondent State Liquor Authority (SLA) in the name of the corporate petitioner. In 1974, Wadud planned to open a discotheque at a location distant from the restaurant. He applied for its liquor license on February 26, 1974 under the corporate name Nirvana Bangalee Indian International Corp. Shortly after it was opened in late May and while its license application was pending, two men, Graziano and Pennini, accosted Wadud at the discotheque and advised him that he would have problems if they were not made his partners. Wadud immediately informed the Federal Bureau of Investigation (FBI) and was told to keep it advised of any further problems. At the revocation hearing Wadud testified that the FBI agent instructed him to tell no one of what had happened and this is substantiated by an FBI report in evidence that these were Wadud's "initial instructions". Wadud also informed the FBI of the ensuing events.

Soon Pennini returned to the discotheque, and while he was there a number of men came in and started a fight. Pennini told Wadud that he knew one of the men and could stop the fight, and he did. Pennini then cautioned Wadud that this was the sort of incident that could be avoided if he and Graziano were given a 10% partnership. From then on Pennini and Graziano began appearing nightly .at the discotheque and assumed an attitude of control. Commencing on June 23, Pennini gave Wadud money on five consecutive days until the total had reached about $15,000, explaining that this was a gift to carry the discotheque over the slow summer period and while the liquor license was pending. In July or August, Pennini and Graziano gave Wadud $18,500 as a loan with interest payable at either 2% or 3% a week. During this time a man named Mirra appeared, claiming that he had been delegated to collect an account owed by Wadud for discotheque furnishings. Mirra suggested that the account be paid by giving him a partnership interest. Wadud reported this to Graziano and Pennini and they took over negotiations with Mirra but in exchange demanded a 25% interest in the discotheque. In the meantime, on June 25, Wadud had been examined under oath by an employee of the SLA investigating his source of funds for the discotheque. By that date he had received two, and possibly three, payments from Pennini of the $15,000 eventually paid, but he did not disclose it. In late August, Wadud closed the discotheque and withdrew the application for a license. All of Wadud's problems with Mirra, Pennini and Graziano were reported to the FBI and on at least one occasion he was equipped with a recording device for a meeting with Graziano and Pennini. He also appeared before a Grand Jury but no indictments issued. In late September, 1974, an editor of the *New York Times,* who was a frequent customer at the Nirvana, asked Wadud what had happened to the discotheque and Wadud told the whole sordid story. In mid-October it appeared in the newspaper. As a result Wadud was summoned to the offices of the SLA and on December 5, 1974 he related to the authority for the first time what had occurred. Four charges resulted, the hearing officer sustained all four after a lengthy hearing and the full board of the SLA confirmed his findings. The license for the Nirvana restaurant was revoked and the bond ordered forfeited. We find no substantial evidence to support Charges Nos. 2, 3 and 4. Charge No. 2 alleged a failure of the petitioner to keep adequate books and records, but the respondent's bill of particulars limited this charge to books and records for the period from February through May, 1975 (see *Matter of Waxenberg v New York State Liq. Auth.,* 40 AD2d 869). No proof was offered to establish a violation during this period and the findings of the hearing officer sustaining this charge relate to another time period. In substance Charge No. 3 alleges that petitioner, in connection with its 1975-1976 application to renew its restaurant liquor license, concealed or suppressed loans from Graziano, Pennini and Mirra. This application, submitted on February 24, 1975, contained a provision requiring the licensee "to set forth details of all outstanding loans * * * which had not been reported to the Authority or having been reported, had not been acknowledged by the Authority". The hearing officer found that Wadud had disclosed the loans to the SLA on December 5, 1974 but found that the disclosure had not been acknowledged by the authority. This is not supported by the evidence. Wadud testified that he disclosed the loans on December 5. That the employee of the SLA also testified that they had been disclosed to him on that date is acknowledgment by the authority that they had been disclosed. Charge No. 4 alleges in substance that Wadud's concealment of his source of funds in his application for the discotheque license was of such an improper nature as to

warrant revocation of his restaurant liquor license. The findings of the hearing officer concerned only those funds deemed derived from Pennini, Graziano or Mirra. Since the application for the discotheque license was submitted in February, 1974 and there is no evidence that Wadud had ever met Pennini, Graziano or Mirra before May, 1974, this charge cannot be sustained. Charge No. 1 alleges that the conduct of Wadud, in offering false information to the SLA in connection with the discotheque application, was of such an improper nature as to warrant revocation of the restaurant liquor license. There is substantial evidence to confirm the finding that, on June 25, 1974, Wadud gave false information to the SLA when he did not disclose the two or three payments he had received from Pennini commencing two days before. We remand, however, to the respondent for findings whether this falsification was of such an improper nature to warrant the sanctions threatened, taking into consideration uncontradicted evidence, not considered in the hearing officer's findings, that Wadud had been told by the FBI not to tell anyone, and whether Wadud could possibly have been motivated by a desire to keep these payments from the attention of the SLA when he had already told them to the FBI and also, contrary to FBI instructions, was to tell them to the *New York Times.* Concur—Murphy, P. J., Kupferman, Sandler, Lane and Lynch, JJ.